Stewaut, J.
The decedent in his will, after making-some provisions for his wife, devised the residue of his property to certain trustees, who were directed to pay $100 per month to decedent’s mother so long as she lives, and the balance of the income and, in the discretion of the trustees, part of the corpus of the estate, if necessary, to various beneficiaries, including decedent’s widow, sisters and sisters’ children, as directed by the trust.
Decedent’s widow elected to take under the statute of descent and distribution and was thereby entitled to one-half of the estate.
The various accounts referred to in the statement of facts show that a large portion of the estate consisted of stocks of railroad companies, some of which stocks were sold during 1946, and a large portion of which were sold in September 1947.
There is no charge in this dispute, or any evidence to justify one if it had been made, that the executors *574 were guilty of any fraud, corruption or dishonesty in their administration of the estate. The facts show that from the time of decedent’s demise until the sale of the stocks the market steadily declined, and that the executors refrained from selling the various stocks which had come into their possession with the hope, apparently along with that of vast masses of people, that they would again rise in price.
The question for us to determine is whether executors of an estate are liable for negligence or nonfeasance because of their failure to sell securities in an estate at the time of acquisition, where the market declines between the time of acquisition and the time of sale.
Exceptor takes the position that, although it may be true an executor is not liable for not selling securities in his possession at the peak of the market, nevertheless, if he determines that it is to the best interests of the estate and desirable for the liquidation of the debts thereof to sell securities immediately after their acquisition and then does not proceed to carry out that determination, he is liable for the loss due to the fall in the market from the time of the determination to the time of sale.
Ordinarily, where a fiduciary is entrusted with securities and has the power of sale, in the absence of fraud or bad faith he can not be charged with any loss if he fails to make a sale at the peak of the market. The absurdity of any contrary rule is at once apparent. If the market was lower at the time the securities were sold, and the fiduciary was to be charged with the loss for not selling them at an earlier date, it would logically follow that, if he had sold them at the earlier date and the market had advanced, he would be held liable for not having held the securities and thus realized the gain.
*575 Two of the executors in the present ease had large interests in the estate of decedent. The widow, one of the executors, was entitled to one-half of the estate under the laws of descent and distribution, and it is difficult to conceive that she was not acting in what she deemed to be the best interests of the estate.
In the case of In re Estate of Stafford, 46 Ohio Law Abs., 260, 69 N. E. (2d), 208, the court made some persuasive statements relative to a situation quite similar to the facts in the present case.
In that case, a motion to certify the record to this court was overruled (case No. 30860).
Although it is true that the overruling of a motion to certify is in no sense an affirmance of a judgment entered by a Court of Appeals, we quote excerpts from the Ohio Law Abstract report of the Stafford case, because of their persuasive reasoning:
“There is no positive specific mandate in the statutory provisions governing the discretion of executors in the administration of an estate, requiring such executors to sell stocks found by them in the estate of their decedent.
6 i * * *
“Limiting the present charge of the exceptors, therefore, to the period when any misconduct of the executors was effective to injure the estate: The ex-ceptors charge that such misconduct of the executors consisted in (1) retaining the stocks in the estate in the presence of a falling market; (2) in failing to obey the mandate of the law requiring them to reduce such stocks to more stable securities, and pay the debts of the estate; (3) in retaining the stock of The Onion Trust Company, when it was a coexecutor of the estate. * * *
“* * * Holders of the stock of the trust company were confronted with a dilemma to sell or keep their *576 stock. * * * It is apparent that there were many persons who considered the economic failure only a temporary depression and that the wise course was to retain stocks and even buy more at the falling prices. # # #
ÍÍ * * *
“Whether the stocks in the estate were rising or falling in value, the same dilemma was presented— whether it was for the best interest of the estate to sell. Error in judgment shown by later devlopments would have entailed bitter criticism of the action taken in either event. If the stocks had continued to rise after sale by the executors they would have been charged with the same bad faith of which they are now accused because they did not sell in face of the later falling market.
“It must be borne in mind, and this fact seems to be lightly considered by the exceptors, that essentially the individual coexecutors had each practically a one-third interest in the estate. Any action they took or failed to take therefore directly affected their own personal interest.
< < * # #
‘ ‘ * * * They were placed much in the position of the captain of a ship who must make the decision to abandon ship or ride out the storm in his battered vessel. * * #
“The conclusion of the Probate Court that the mere failure to sell the stocks did not sustain either a charge of actual fraud or culpable negligence must be sustained. ’ ’
Of course, if the executors in the present case had knowledge of any conditions concerning the stocks which were likely to cause them to depreciate in value, a different question would arise, but it is our opinion that merely holding them in a declining market for a *577 little more than a year is not evidence of culpable negligence or nonfeasance, even though the holders had determined to sell them earlier and had abandoned that determination.
It will be remembered that under item XI of decedent’s will the executors had “full right, power and authority to bargain, sell, convey, transfer, deed, compromise, settle, adjust, manage and deal with any and all of my property and obligations or claims against my estate, upon such terms and under such conditions as they shall deem wise for the proper settlement of my estate without the order of any court.”
How could one entrusting his property to a fiduciary give a wider or more unlimited discretion?
If a fiduciary is given the power to deal with any or all the property of another in a manner as such fiduciary deems wise, and such fiduciary deals with and disposes of such property in relation to the objectives for which he is entrusted with it, he can not be held to account in the absence of fraud, dishonesty or bad faith. See Caswell v. Lenihan, ante, 331.
It seems to us that under the circumstances of this case the assets of the estate, which assets the decedent himself had acquired, simply shrank as did the assets of many shareholders whose stock declined in the market during the period involved in the present controversy, and that the shrinkage simply resulted in damnum absque injuria.
Any other view of the case would make it almost impossible to secure competent persons to act as executors or administrators of estates or to secure bonds for .the faithful performance of their duties.
One theory of exceptor is that holding the securities for more than a year constituted a reinvestment of the funds of the estate in securities, contrary to the power or authority of executors set forth in Sec *578 tion 10506-41, General Code (Section 2109.37, Revised Code), which reads in part as follows:
“Provided that no administrator or executor shall have authority to invest funds belonging to the estate except with the approval of the court or where the will or other instruments creating the trust permits.”
In the present case, the moneys received from the sale of the assets of decedent’s estate were not reinvested but were used to pay the indebtedness of the estate and were then transmitted, along with certain securities not sold, to the trust provided in decedent’s will.
Under the circumstances, Section 10506-41, General Code, has no application.
The judgment of the Court of Appeals is reversed and that of the Probate Court affirmed.

Judgment reversed.

Weygandt, C. J., Matthias, Hart, Zimmerman and Bell, JJ., concur.
Taft, J., concurs in paragraph three of the syllabus and in the judgment.